J-S34017-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: Z.J.C., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 632 WDA 2023 |

Appeal from the Decree Entered December 19, 2022
In the Court of Common Pleas of Blair County
Orphans' Court at No: Docket No. 2022 AD 15

| | | |
|---|---|---|
| IN RE: E.R.K., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 633 WDA 2023 |

Appeal from the Decree Entered December 19, 2022
In the Court of Common Pleas of Blair County
Orphans' Court at No: 2022 AD 15A

BEFORE: LAZARUS, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY STABILE, J.: **FILED: December 29, 2023**

C.C. ("Mother") appeals *nunc pro tunc* from the decrees entered on December 19, 2022, in the Court of Common Pleas of Blair County, involuntarily terminating her parental rights to her daughter, Z.J.C., born in

October of 2015, and son, E.R.K., born in July of 2020 ("the Children").[1]  We affirm.

Mother has eight children, and the Children in this case are her two youngest.  R.R.C., Jr., now deceased, was the biological father of all but E.R.K.  Mother and R.R.C., Jr., have an extensive history of substance abuse and incarceration.  ***See*** N.T., 10/3/22, at 63.  Further, Mother suffers with psychological symptoms which the court-appointed forensic psychologist, Terry O'Hara, Ph.D., described as "lack of assumption of responsibility, impulsivity, substance use, depression and anxiety."  N.T., 8/18/22, at 8.

The genesis of the subject decrees was when Blair County Children, Youth & Families ("CYF") opened a case for this family in March of 2020, due to R.R.C., Jr.'s, impending incarceration, and behavioral problems of Z.J.C. and some of her siblings.[2, 3]  On December 30, 2020, the juvenile court

---

[1] In addition to Mother, the subject decrees involuntarily terminated the parental rights of R.R.C., Jr., who was Z.J.C.'s natural father and E.R.K.'s presumptive father.  R.R.C., Jr., subsequently died on a date unspecified in the record but prior to Mother filing the *nunc pro tunc* appeals.  E.R.K.'s natural father, B.S.E., relinquished his parental rights, and the court terminated them by decree dated March 17, 2023.

[2] CYF first opened a case for this family in 2016.  Z.J.C. was previously adjudicated dependent from November of 2016, until April of 2017.

[3] Unless otherwise noted, the relevant facts and procedural history is derived from the Children's dependency records which were incorporated into the record during the involuntary termination proceeding.  ***See*** N.T., 5/10/22, at 8.  The Honorable Wade A. Kagarise presided over the involuntary termination proceeding as well as the underlying dependency matters.

adjudicated Z.J.C. dependent. She remained in the legal and physical custody of Mother under a safety plan until March 26, 2021, when the court transferred custody to CYF due to Mother's lack of supervision and incarceration that same month.[4] Z.J.C., then five years old, was placed in foster care with a married couple who had been Mother's landlords.[5]

With respect to E.R.K., he was born prematurely in July of 2020, at which time he and Mother tested positive for amphetamines and methamphetamines, *inter alia*. E.R.K. was discharged into Mother's custody, where he remained until he was four months old. He was placed in the emergency protective custody of CYF in December of 2020, as a result of Mother failing to take him to his scheduled medical appointments. Like Z.J.C.,

_____

[4] In March of 2021, Mother was charged with multiple drug-related felonies and incarcerated for an unspecified time. She was ultimately released while the charges were pending. It is undisputed that Mother was sentenced to a term of incarceration of three and one-half to six years and re-incarcerated in the Fall of 2022, prior to the conclusion of the termination proceeding, discussed *infra*.

[5] According to H.G., Z.J.C.'s foster mother, she and her husband were

> the landlords of the apartments that [Mother] was living in at the time and just kind of organically formed a relationship through that. A lot of times [Z.J.C.] would be down hanging out with my husband and I while we [were] working on other units for hours. Then she started to ask about coming over and we started doing sleepovers and stuff and just kind of organically developed a relationship that way. Then when [Mother] went to jail the first time she had called and asked if I was willing to care for [Z.J.C.] while she was in prison.

N.T., 8/18/22, at 48.

E.R.K. was adjudicated dependent on December 30, 2020, and the court placed him in the legal and physical custody of his paternal aunt.

The Children's placement goals were reunification with the concurrent goal of adoption. Permanency review hearings were held at regular intervals. Mother's permanency objectives included, in part, participating in random drug screens; maintaining sobriety; attending supervised visitation and displaying appropriate parenting skills; maintaining appropriate housing; and resolving her criminal charges. Mother was court-ordered to engage in services related to drug and alcohol, mental health, and intimate partner violence ("IPV").

By motions filed on April 24, 2022, CYF requested that the Children's goals be changed to adoption based on allegations that Mother tested positive for amphetamines and methamphetamines in February of 2022; communicated inappropriately with the Children during supervised visits; and had unresolved criminal charges. On April 28, 2022, CYF filed petitions for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).

The court held a combined goal change and involuntary termination hearing which commenced on May 10, 2022, and was continued to August 18,

2022, and October 3, 2022.[6]  Z.J.C., then seven years old, was represented by a guardian *ad litem* ("GAL") and separate legal counsel.  E.R.K., who turned two years old during the pendency of the proceeding, was represented by the GAL.[7]

CYF presented testimony from Candace Lawson, a family advocate for the Bair Path House who supervised Mother's visits with the Children; Terry O'Hara, Ph.D., a forensic psychologist who performed both individual and interactional psychological evaluations involving Mother; R.B., E.R.K.'s foster mother and paternal aunt; H.G., Z.J.C.'s foster mother; Shane Fagan, CYF caseworker; and Jennifer Walter; the supervisor from the Bair Path program that supervised visits for Mother and the Children.[8]  Mother, then incarcerated at Blair County prison, testified on her own behalf.

By orders dated December 16, 2022, the orphans' court changed the Children's permanency goals to adoption.  By decrees entered on December

_____

[6] In addition to the Children, the subject proceeding included the permanency reviews for two of their older siblings.

[7] Because E.R.K.'s legal interests were incapable of ascertainment due to his young age, the court did not appoint separate legal counsel for him.  ***See In re T.S.***, 192 A.3d 1080, 1092-1093 (Pa. 2018) (holding, "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act" is satisfied.).

[8] CYF also presented witnesses who testified solely with respect to Mother's older children, who we do not list here.

19, 2022, the court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).

On February 24, 2022, Mother sought relief in the orphans' court to file notices of appeal *nunc pro tunc* from the involuntary termination decrees, which the court granted by orders docketed on March 28, 2023. On the same date, Mother filed notices of appeal *nunc pro tunc* and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*. On April 10, 2023, the orphans' court filed an opinion pursuant to Rule 1925(a).

On appeal, Mother raises the following two issues for review.

I.    Whether the [orphans'] court erred and/or abused its discretion in terminating the parental rights of [Mother] where insufficient evidence was presented supporting the petitions for involuntary termination and/or was significantly undermined by contradicting evidence during the evidentiary hearings on the petitions?

II.    Whether the [orphans'] court erred and/or abused its discretion in terminating the parental rights of [Mother], in that [Mother]'s projected release date from incarceration was 2023 or 2024?

Mother's Brief at 4.[9]

We consider Mother's issues in the context of determining whether the involuntary termination decrees are supported by competent evidence. **See In re Adoption of C.M.**, 255 A.3d 343, 358 (Pa. 2021). When applying this

---

[9] The GAL joined in the appellee brief filed by CYF advocating for affirming the termination decrees.

standard, appellate courts must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. *See Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

Our Supreme Court has explained, "An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion," or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826–827 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *See Interest of S.K.L.R.*, 256 A.3d at 1123–1124.

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act ("Act"), which requires a bifurcated analysis. *See* 23 Pa.C.S.A. § 2511. The trial court must initially determine whether the conduct of the parent warrants termination under Section 2511(a). Only if the court determines that the petitioner established grounds for termination under Section 2511(a) does it then engage in assessing the petition under

Section 2511(b), which involves a child's needs and welfare. ***See In re***

***T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).

To involuntarily terminate parental rights, the petitioner must prove

grounds under both Section 2511(a) and (b) by clear and convincing evidence,

which is evidence that is so "clear, direct, weighty, and convincing as to enable

a trier of fact to come to a clear conviction, without hesitance, of the truth of

the precise facts in issue." ***C.M.***, 255 A.3d at 359 (quoting ***Matter of***

***Adoption of Charles E.D.M., II***, 708 A.2d 88, 91 (Pa. 1998)).

In this case, we review Section 2511(a)(2) and (b),[10] which provide as

follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental,

---

[10] Based on this disposition, we need not review the decrees with respect to Section 2511(a)(5) and (8). ***See In re Adoption of K.M.G.***, 219 A.3d 662, 672 (Pa. Super. 2019) (*en banc*) (reiterating that we need only agree with any one subsection of Section 2511(a), along with Section 2511(b), to affirm the termination of parental rights) (citation omitted).

physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

The grounds for termination of parental rights under section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; those grounds may also include acts of refusal and incapacity to perform parental duties. *See In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021) (citation omitted). Section 2511(a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being," especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation and emphasis omitted).

We have long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *See In re Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017) (citation omitted). At a termination hearing, the orphans' court may properly reject as untimely or disingenuous a parent's vow to follow through on necessary services when the parent failed to co-operate with the

- 9 -

agency or take advantage of available services during the dependency proceedings. *See In re S.C.*, 247 A.3d at 1105 (citation omitted).

In *In re Adoption of S.P.*, *supra*, our Supreme Court addressed the relevance of incarceration in termination decisions under Section 2511(a)(2). The *S.P.* Court held that "incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied." *Id.* at 828.

With respect to Section 2511(b), the court is required to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). Regarding the "emotional needs and welfare" of the child, our precedent has interpreted it to include "intangibles such as love, comfort, security, and stability." *T.S.M.*, 71 A.3d at 267 (citation and quotation marks omitted).

Our Supreme Court in *In re E.M.*, 620 A.2d 481 (Pa. 1993), first recognized that the "emotional needs and welfare" analysis under Section 2511(b) should include, in part, the child's bond with his or her parent. In doing so, trial courts must examine the effect on the child of severing such a bond, and this includes "a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's

developmental, physical, and emotional needs and welfare." ***In the Interest of K.T.***, 296 A.3d 1085 (Pa. 2023).

The ***K.T.*** Court recognized that "case law indicates that bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." ***K.T.***, 296 A.3d at 1109. For instance, if relevant in a case, a trial court "can equally emphasize the safety needs of the child" in its analysis under Section 2511(b). ***See In re M.M.***, 106 A.3d 114, 118 (Pa. Super. 2014).

In the case *sub judice*, initially we observe that Mother failed to assert an error regarding Section 2511(b) in her concise statements of errors complained of on appeal and statements of questions involved in her brief. Therefore, Mother has waived any claim concerning it. It follows that we do review the decrees in the context of Section 2511(b). ***See In re M.Z.T.M.W.***, 163 A.3d 462, 466 (Pa. Super. 2017) (citation omitted) (finding that, because the appellant-mother "failed to include a challenge to Section 2511(b) in her statement of questions involved and concise statements that issue is also waived.")

Turning to Mother's arguments regarding Section 2511(a), she contends that her conduct did not warrant termination. Specifically, in her first issue, she asserts that she "was actively engaged in discussions regarding the

[C]hildren's educational needs and medical appointments." Mother's Brief at 16. In addition, she asserts that she consistently attended supervised visitation with the Children. *Id.* at 16-17.

In her second issue, Mother asserts that she was sentenced on her multiple felony charges to a term of incarceration following the first day of the termination proceeding. Mother claims that her minimum release date is three-and-one-half years, and that she is eligible for the state drug treatment program. *Id.* at 17-18. Mother baldly asserts that, if she successfully completes the state drug treatment program, she will be eligible for release from incarceration in 2023 or 2024, prior to her minimum sentencing date. *Id.* Because of Mother's alleged early release date, she argues that the court abused its discretion to the extent it terminated her parental rights due to her incarceration. *Id.* at 18. For the reasons that follow, Mother's issues are meritless.

The orphans' court found as follows.

Mother was convicted in the Fall of 2022 for various drug offenses and received a sentence of 3 ½ to 6 years [of] incarceration. The court acknowledges that Mother did receive permission in the state drug treatment program which would allow for release prior to her minimum sentence. However, it is uncertain as to whether or not Mother will successfully complete the state drug treatment program. In addition to her incarceration, testimony established that Mother never acquired stable housing to effectuate reunification with the Children, did not consistently engage in her court ordered services, and did not take responsibility in her role in the Children's initial placement. Mother failed to engage with [CYF] and their directives which included failure to show up for office appointments and refusal to participate in consistent drug tests. She also had positive drug tests in 2022. We also note that

[CYF] presented expert testimony from Dr. Terry O'Hara, a forensic psychologist, who concluded that Mother's ability to successfully reunify with the Children was poor. . . .

Orphans' Court Opinion, 4/10/23, at 3 (unpaginated) (cleaned up). The record supports the court's findings.

We begin with Dr. O'Hara's testimony regarding his December 2021 individual psychological evaluation of Mother. Dr. O'Hara summarized "a variety of concerns," as follows.

[Mother] was homeless at the time of the evaluations in December. She acknowledged using substances as soon as she was released from incarceration.[11] She acknowledged relapsing with cocaine, meth and bath salts. She reported a "toxic end of" relationship with the children's father. She alleged controlling behaviors and verbal abuse by her form[er] paramour. She reported extreme impulsivity, significant depression, and significant anxiety, both of which negatively impacted her functioning. She endorsed hypomania for two[-]day periods. That would include symptoms of bipolar disorder lasting for two days to include elevated energy levels, a lot of impulsivity, racing thoughts, that sort of presentation. Further, she had not participated with Women Aware. She cited a lack of transportation, even though she had disclosed IPV from a few relationships. She acknowledged her recent relapse. She was actually kicked out of Crossroads due to positive urines. She had multiple pending felonies. . . . Her responses were in the clinical range with regard to depression on the BDI-II, which is the Beck Depression Inventory. Her presentation was in the significant range on the Beck Anxiety Inventories. So that essentially indicates that depression and anxiety are problematic for her likely negatively impacting her functioning.

_____

[11] As stated *supra*, Mother was incarcerated in March of 2021, which precipitated the transfer of Z.J.C.'s custody to CYF. Mother was ultimately released and participated in supervised visitation with the Children until her sentencing and re-incarceration in the Fall of 2022.

- 13 -

N.T., 8/18/22, at 7-8 (cleaned up). With respect to his interactional evaluation between Mother, the Children, and their older siblings which also occurred in December of 2021, Dr. O'Hara testified that Mother

> did not show any prioritization of the children's psychological needs. She did not engage with several of the children for much of the evaluation. She spoke about inappropriate topics including being robbed by a roommate. . . . She often weep[ed] during the evaluation. It was very poor emotional regulation by her. . . . She essentially ignored four of the younger children. . . . It was my impression that the children had to assume more of a parental role with [M]other during this evaluation. They were offering her reassurance as opposed to [Mother] really prioritizing their need. . . .

*Id.* at 8-9. Dr. O'Hara concluded that Mother had a "poor prognosis" for rehabilitation "given the extent of the mental health issues, given the extent of the substance abuse concerns, and how these issues have negatively impacted her functioning and her capacity to prioritize her children's needs. . . ." *Id.* at 16.

Notwithstanding Mother's recent sentence of incarceration, Dr. O'Hara opined that the Children "would not be able to see consistency, stability, security and safety if they were to be with [M]other at this time." *Id.* at 9-10. Further, he testified that the Children achieving permanency at this point in their lives "is extremely important." *Id.* at 11. He explained:

> Children of those ages really have much better outcomes in a variety of areas if they experience a factor that is typically inherent in permanency, including safety, stability and security. They do much better in terms of school of readiness. They do better with regard to . . . achievement in school. They are left at risk for psycho pathology. They are left at risk for substance abuse issues. So, there is a lot of factors which can influence an

- 14 -

upward trajectory developmentally for children when they experience factors in parents in permanency as opposed to children who don't experience those factors.

*Id.* at 11-12. In sum, Dr. O'Hara opined that Mother was not capable of being successfully reunified with the Children due to her "mental state, her struggling with a variety of psychological symptoms, her appearing overwhelmed with her presentation, the unaddressed IPV issues and the unaddressed substance abuse concerns." *Id.* at 10.

Shane Fagan, the CYF caseworker for the family from January of 2022, through the time of the termination proceeding, corroborated Dr. O'Hara's conclusion that, notwithstanding Mother's incarceration, she was unable to reunify with the Children. *See* N.T., 10/3/22, at 49. Indeed, he testified that Mother did not satisfy her drug and alcohol or housing objectives prior to her incarceration in the Fall of 2022. *See id.* at 39, 48-49, 51-52.

With respect to Mother's supervised visitation, they occurred for four hours weekly with the Children and their two older siblings. *See* N.T., 5/10/22, at 9. Both Ms. Lawson and Ms. Walter testified that Mother regularly initiated inappropriate conversations with the Children and their siblings. *See* id. at 46-47; *see also* N.T., 10/3/22, at 17, 25. Ms. Lawson testified that, despite re-direction, Mother "struggled to keep conversations appropriate [and away from] court-related topics or discussions on jail or when you return home conversations." N.T., 5/10/22, at 12, 15. Ms. Walter testified that Mother's inappropriate conversations occurred up until her last supervised

visit on August 2, 2022, just prior to her re-incarceration, which Ms. Lawson corroborated. *See* N.T., 10/3/22, at 15, 17; *see also* N.T., 5/10/22, at 13.

In addition, Ms. Lawson testified that Mother had an ongoing problem with supervising E.R.K. during the visits. *See* N.T., 5/10/22, at 17, 47. She explained that at "[m]any visits, no one knows that [E.R.K.] is missing. He explores into the kitchen, the office and other visit rooms. Other staff members and myself and [Mother's older] children do intervene to go get him when redirected." *Id.* at 12-13; *see also id.* at 39. Ms. Lawson testified on redirect examination:

> Q. [G]iven [E.R.K.]'s age, would you have concerns with [Mother]'s current ability to effectively supervise him in any other manner other than the complete supervision that Path House provides?
>
> A. Yes, without supervision, I would have concerns.

*Id.* at 47.

Moreover, Mother's testimony supports the court's finding that she does not take responsibility for the placement of the Children and their siblings. Mother exclaimed on cross-examination, "[I]t wasn't the drug addiction. It was the harassment that CY[F] constantly is doing," which resulted in the Children's dependencies. N.T., 10/3/22, at 65; *see also id.* at 63 (On cross-examination, with respect to whether her substance abuse has impacted the children's ability to have consistency and stability in their lives stemming from CYF's initial involvement with the family and 2016, Mother responded, "No, because if CY[F] wouldn't have been involved, me and [R.R.C., Jr.,] would

have never stepped out of our kids' lives. They still would have had us consistently one way or another."). Mother ultimately provided the following self-contradictory testimony.

> Drug addiction is not the end of anything. [R.R.C., Jr., and I] wouldn't be drug addicts if we didn't relapse. I am sorry for the people that are affected along the way, but that is why there's programs and that's why there is supposed to be agencies like CY[F] who are supposed to help families get back together and not rip them apart. But when it is one-sided and all I have heard is how I haven't done this and I haven't done that, but yet I haven't abused my kids and neglected them. I neglected myself which turned into neglect for them.

*Id.* at 67.

Mother admitted using illegal substances during the Children's dependencies, and that she "did struggle with staying in a Suboxone clinic. . . ." *Id.* at 58, 60. She also testified that she never completed the program Women Aware, which we glean was related to her IPV history. *Id.* at 60. Mother stated to the orphans' court, "I believe my children should come home eventually. I'm not asking you to do it tomorrow, and I'm not asking you to do it January 1st when [R.R.C., Jr.,] gets out of jail. I am just asking you to give us a chance to be good parents. . . . Give us a chance to do the programs and prove that we can be good people." *Id.* at 68.

The orphans' court was not required under Section 2511(a)(2) to permit Mother more time to provide the Children with essential parental care, control or subsistence necessary for their physical or mental well-being. *See In re S.C.*, 247 A.3d at 1105 (citation omitted). We do not disturb the decrees to

- 17 -

the extent that the court found Mother's vow to comply with necessary treatment programs untimely or disingenuous. ***See id.***

Based on the foregoing, the evidence amply demonstrates that Mother's repeated and continued incapacity, neglect or refusal caused by her substance abuse, related incarceration, and mental illness has caused the Children to be without essential parental care necessary for their physical and mental well-being. Further, the testimony of Dr. O'Hara as well as Mother, inasmuch as she blames CYF for her family disruption, amply demonstrates that her incapacity, neglect or refusal cannot or will not be remedied. Thus, Mother's issues on appeal are meritless. Accordingly, we affirm the decrees pursuant to Section 2511(a)(2) and (b).

Decrees affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

12/29/2023